[No. 1621.]

## Perry Cavitt *v.* The State.

1. Jury Law.—In the selection of jurors the law of Texas ignores all considerations of race or color, but invests no court with supervisory power over the selections made by the jury commissioners. If any supervisory power inherently belongs to the courts, it would be exercised only in a clear case of fraud or corruption in the action of the jury commissioners, or to avert such wrong as would shock the sense of justice and frustrate the purposes of law.

2. Same—Civil Rights of Negroes.—A negro being charged with the murder of a white man, his counsel moved the trial court to quash the special venire, because: first, the jurors were selected solely from persons known to be not the equals but the superiors of the defendant; and, second, because the jury commissioners, by refusing to select negroes as jurors, unjustly discriminated against persons of the negro race. The facts were that the jurors who tried the case were white men who were legally drawn from the list of jurors legally selected at the preceding term of the court, and before the homicide was committed. The trial court entertained the motion to quash, heard evidence upon it, and, no fact being shown in its support, overruled it. *Held*, correct.

3. Same—Constitutional Law.—The provision of the Code of Procedure (Article 625) which prohibits any challenge to the array of jurors selected by jury commissioners does not contravene the Fourteenth Amendment to the Constitution of the United States. The criminal laws of this State make no distinction between colors, races, nationalities or conditions of individuals, but regard all as equals and as entitled to equal protection.

4. Jury Law—Practice.—In testing the bias or prejudice of a proffered juror, proper questions should be allowed; but, to be proper, a question should be relevant to the juror's impartiality. Whether the juror had the "same neighborly regard" for a negro as for a white man was an irrelevant inquiry, and was properly disallowed. And if the disallowance of the question was not proper, it would not be revised on appeal, or held to be material error, unless it clearly appeared that the trial court, in disallowing it, abused its discretion to the prejudice of the appellant.

Statement of the case.

5. EVIDENCE—PRACTICE.—Objections to the rulings of the trial court in the admission or rejection of evidence must be taken at the trial in that tribunal. If not made there, they are to be considered waived on appeal.
6. MURDER—FACT CASE.—See evidence held sufficient to sustain a capital conviction for murder.

APPEAL from the District Court of Brazos. Tried below before the Hon. W. E. Collard.

On September 7, 1883, the grand jury of Brazos county presented an indictment charging Perry Cavitt, the appellant, with the murder of William Bracknell, by shooting him with a gun, on August 7, 1883. The trial was had at the same term of the court, and resulted in the conviction of appellant for murder in the first degree, and the assessment against him of the death penalty.

The opinion of this court will be found to indicate the material facts underlying the leading rulings in the case, which obviously had their origin in questions suggested by the fact that the appellant was a negro and the deceased a white man.

Mrs. M. A. Bracknell, the widow of the deceased, testifying for the State, said that about noon on the seventh of August, 1883, one Lewis Martin and the defendant drove their wagon into the yard of deceased, between the house and the well, which was close to the house. They were getting water out of the well, without permission to do so or to come there, and the deceased went to the door and told them to get out of his yard. Words ensued, and the deceased came into the house and got his pistol, and then went into the yard; and soon afterward the witness heard two pistol shots. The deceased came back into the house and said he had ordered them off; that they would not leave; that Martin had thrown the water bucket at him, and Cavitt, the defendant, drew a large stick on him; and that he had shot to scare them away, but not to hit them. About an hour before sunset of the same day, Martin and the defendant drove up to the house in a wagon. Deceased was lying on a pallet on the gallery. He had been shooting rabbits in the field, and still had his pistol in his pocket. Martin and the defendant stopped and called to the deceased to come out, and said they wanted to talk to him. He went into the yard, near the fence, and as he got up he pushed the pistol further into his pocket. They told him to come on out, and he said no, that he could hear them where he was. Witness then saw Mar-

tin and the defendant get their guns, which were in the wagon. Martin stood up in the wagon; the defendant jumped out onto the ground. They presented their guns to shoot the deceased, and at that the witness got frightened and ran back into the door of the house. As she did so she heard first one shot and then another. After the firing ceased she went to the door. The defendant and Martin had then gone, and the deceased was trying to walk to the house. Deceased said they had killed him, and that Cavitt's shot was the one that had hit him. Witness helped the deceased to the gallery, and then ran to her brother's house, after her brother. She tried to get a doctor, but did not succeed until the next day, when she got Doctor Jones. As the deceased got up from the pallet, witness saw him push his pistol down in his pocket. She could not say whether or not he had his hand on his pistol when he was shot. Her attention was not directed to him at that instant. He did not have his pistol in his hand when witness saw him after he was shot. Deceased was shot in Brazos county, Texas, on the seventh of August, 1883, and died on the twenty-sixth of the same month.

Doctors Jones and Smythe, whose professional services were obtained for Mr. Bracknell, gave a lucid description of the wound which resulted in his death. The ball had entered the left hip, on the side and near the trunk. An aneurism was produced by suffusion of blood from the femoral artery, which had been bruised or lacerated by the ball. The physicians found it necessary to take up and tie the artery above the aneurism, as a safer and more advisable operation than to take off the leg at the hip joint in the first instance. For a few days the operation promised entire success, but then it became obvious that the collateral circulation of the blood was not sufficient to supply the limb, and that amputation was the only hope of saving the life of the patient. They accordingly amputated the thigh at a joint where the circulation had been well established. The patient rallied from the operation, but in a few days grew weaker, and on the twenty-sixth of August, 1883, he died from the effects of the wound. The surgical treatment was necessary and the operations skillfully performed. A *post mortem* examination clearly demonstrated the accuracy of the diagnosis and the propriety of the treatment.

Frank Wilson, for the State, testified that about noon of August 7, 1883, he was at William Power's house, which was

about half a mile from Bracknell's, when Martin and the defend-
ant came walking rapidly up to Powers and said that Bracknell
had shot at them. Martin said he was shot in the leg, and his
leg was bleeding, but witness did not examine it. They wanted
witness and others to go Bracknell's after their wagon. Powers
had sold them some sugar cane, which was in the same field
occupied by Bracknell, and were hauling it by a road which was
not the road used for hauling. Martin said, " We are going to
get a gun and fix the old man." Witness replied, " No. Louis,
you had better not do any such thing. The old man is in his
own yard, and it would be a bad thing if you were to shoot him
in his own yard." Defendant was present, and heard this con-
versation between Martin and the witness. The witness and
others went after the wagon, and as they were bringing it away
they met Martin and the defendant, and delivered the wagon to
them. Witness saw the defendant the next day, and defendant
told him that he and Martin went to Bracknell's and called him
out; that Martin jumped off the wagon on the side next the
barbed wire fence, and shot him from the wagon; and that he,
the defendant, jumped off the wagon on the other side and shot
Bracknell from the ground. Nathan Johnson was present and
heard what the defendant said. If the defendant said that
Bracknell came out with his pistol in his hand, and attempted
to shoot, the witness stated that he had no recollection of it.

Mark Wilcox, who lived about two miles from the deceased's,
testifying for the State, said that about two o'clock in the after-
noon of the day on which Bracknell was shot, Martin and the
defendant came to witness's cane mill with a load of cane, un-
loaded it and stayed around, talking. Martin told witness that
they had had trouble with Bracknell, whose name Martin did
not know, but whom he described. He said Bracknell had shot
him in the leg, and showed witness the place. Witness exam-
ined the place, and also a hole in Martin's pants. They did not
look like they were made by a shot, but looked like a scratch or
torn place, such as a barbed wire would make. Martin said the
ball was in his leg, but the witness examined and could find no
bullet hole in his leg. Witness had seen many shot wounds.
Martin said they were going to have satisfaction. Witness told
Martin that if Bracknell had done what he said, he had better
go to town and have him arrested and prosecuted; that we had
laws and men to execute the laws. Martin replied that he
would not go to law; he was going to have satisfaction. De-

fendant was present and heard all the conversation between Martin and the witness. Martin and defendant then asked witness for a watermelon, and he told them to go to his patch and get one. They went to the patch, a quarter of a mile off, got a melon, came back, and then went off in their wagon toward the witness's house. Having afterwards heard of the shooting, the witness went the next day to Bracknell's and saw Bracknell in bed, wounded. Witness had never seen Bracknell before. He was fifty-five years old, according to the entry in his Bible. Before his death the witness made frequent visits to his house, and offered such assistance as he could render him. Bracknell and his family were poor, and witness frequently sent them provisions. Bracknell said he would never get well, and never seemed to have any hope of recovery. Witness tried to encourage him, but he seemed to have no hope. At times he was in great agony, and would cry out in pain. On the Thursday night preceding his death witness was sitting up with him at his house. He was very much discouraged and said he knew he was bound to die, and that he could not get well. He was in his right mind, and made a statement to witness about the difficulty. Witness did not ask or induce him to make it. He said that about one or two o'clock on the day of the difficulty, Louis Martin and the defendant drove their wagon into his yard and stopped it near his house. They had driven their wagon down a three-foot turnrow, over his cotton, and had injured his cotton. That he went out and told them to go out of his yard; that they had driven their wagon over his crop. They replied that they had done no such thing, and he told them the cotton was there to show for itself. That they would not leave, and got into a quarrel with him, and Martin threw a water bucket at him, and then he went into his house and got his five shooter and came out into his yard, and then the defendant drew a stick on him, and he fired his pistol. That he did not fire to hit them, but only to scare them away. He shot twice, and they ran off toward Powers's house. He further stated that, about an hour by sun in the same afternoon, he was lying on a pallet on his gallery, and Martin and the defendant drove up and called him out. As he rose up he shoved his pistol into his pocket, and then went out into his yard. They told him to come outside; that they wanted to talk to him. He told them he could hear what they had to say from where he was. Then they got their guns out of the bed of the wagon, and the defend-

ant jumped to the ground. They fired on him, and the defendant's shot struck him. Deceased said that he could not get his pistol out in time to shoot, and that he did not shoot. After they shot they drove rapidly away.

Walter Wilcox, for the State, testified that about half-past two o'clock of the day on which Bracknell was shot, Louis Martin and the defendant came to the house of witness's father, and asked witness if he had any powder and shot. They said they wanted to go rabbit hunting. Witness gave them two loads of powder and four large low-mould buckshot. He told them they could not kill any rabbits with such large shot, but they said they could, and begged him for some more of the shot, and he gave them more. Martin then offered witness a dollar for the loan of his gun that evening, but witness would not let him have it. Then Martin said: "We are going over and get a gun and shoot that old man." They then told the witness of the difficulty they had had, and he tried to get the ammunition back, but they would not let him have it. Then they went off in their wagon towards the Philpot place.

Dick Curry, for the State, testified that he lived on the Philpot place. About four o'clock in the afternoon of the day on which Bracknell was shot, Louis Martin came to witness's house, got witness's gun, and then went up towards Alex. Hatchett's house. Martin said he was going out hunting.

John Bassett, for the State, testified that he lives at Alex. Hatchett's, and is a nephew of the defendant. On the day Bracknell was shot, the defendant and Louis Martin drove up to Alex.'s house in a wagon. Alex. was not at home. Defendant tried to borrow a pistol from the witness, who would not let him have it, and he then went into Alex.'s house and got Alex.'s gun. They said they were going out hunting. They got the witness to shoot off the gun which Martin had got from Dick Curry, and then they loaded the guns and drove off in their wagon. As they drove off, Martin, as witness understood him, said: "We are going to kill a G—d d—d son of a bitch this evening," or, "We are going to kill a G—d d—d son of a bitch if he meddles with us." Alex. Hatchett's is about two miles from the Cole place, on which Bracknell lived. With the testimony of this witness, the prosecution closed in chief.

William Powell, for the defendant, testified that he sold to Martin and the defendant some sugar cane which was in the field in which Bracknell lived, and they were hauling the cane

on the day the latter was shot. Instead of hauling it on the usual road, they drove up a narrow turnrow towards Bracknell's house. After the difficulty in the morning, they came to the house of witness, and he and Frank Wilson went after their wagon for them. Witness and Wilson found the wagon between Bracknell's house and his well, which is close to the house.

G. M. Eastridge, for the defense, testified that he was at Bracknell's in the morning, when the first difficulty took place between Bracknell and the defendant and Martin. Witness did not see the difficulty, but heard him order Martin and the defendant out of his yard. They said they would go when they got ready. He told them they had driven their wagon over his crop, and they denied that they had done so. After some other words, Bracknell came into the house and got a five shooter, and went out into the yard. Witness heard two shots, and Martin and the defendant went away, leaving their wagon in the yard. Witness saw where they had driven their wagon over Bracknell's cotton. They came up a narrow turnrow, which was not used for a wagon road, and on which the witness had never before seen a wagon.

Nathan Johnson, for the defense, stated that he was passing Bracknell's house about twelve o'clock of the day Bracknell was shot, and saw Bracknell come out and shoot three times at Louis Martin. Louis ran, and told the defendant to run; but defendant said he had done nothing to run for, and then Bracknell shot at the defendant. Bracknell was standing in his door when he shot. ¡ He fired about six times. Witness did not stop, being in a hurry to get over to the defendant's, where he was picking cotton. The shooting he saw was in the first difficulty, and not in the difficulty when Bracknell was shot.

With this testimony the evidence was closed. The opinion of this court sufficiently discloses such other matters of fact as are involved in the rulings. Defendant's motion for a new trial being overruled, he appealed.

*J. N. Johnson,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON JUDGE.   1.   There was no error in overruling the defendant's motion to quash the special venire. The grounds of said motion were, first, that the jurors were selected solely from

persons known to be not defendant's equals, but his superiors; second, that in the selection of said jurors the persons or officials selecting did unjustly discriminate against persons of defendant's race and kind, by refusing to select such persons as jurors. Bearing upon this motion the following facts are shown by the record. First, defendant is a negro, and was charged, and has been convicted of the murder of a white man; second, the jurors by whom he was tried were white men, selected from a special venire, and the special venire was drawn in accordance with law from the petit jurors selected at the last preceding term of the court, by commissioners appointed for that purpose, as provided by law, and in strict compliance therewith; third, the jurors so selected by the commissioners were selected *before* the occurrence of the alleged murder of which defendant was convicted, and could not therefore have been selected with reference to his case.

In selecting jurors, the jury commissioners are required to select, from the citizens of the different portions of the county, persons liable to service as jurors, who are free from all legal exceptions, of good moral character, of sound judgment, well informed, and, so far as practicable, able to read and write. (Rev. Stat., Art. 3030.) From the persons selected the commissioners are required to draw, by chance, the names of the persons who are to serve as jurors at the succeeding term of the court. (Rev. Stat., Art. 3031.) It is nowhere required, in the law, that the commissioners shall consider the question of race or color in their selection of jurors, nor does the law anywhere prohibit them from doing so. Upon this subject the law is wisely silent. There is no provision in the law which vests in the court, or in any other tribunal, the power to revise and control the selection of jurors by the commissioners. We do not say, however, that this power does not inherently exist in the court. We think it does, but it would be exercised only in a clear case of fraud or corruption in the action of the commissioners, or some great wrong committed in their selection of jurors, which would shock the sense of justice and defeat the ends of law. (*State* v. *Smith,* 33 La., Ann. 1414; *State* v. *Bradley,* 48 Conn., 535.)

If the objection which is made to the jurors in this case had been presented in the form of a challenge to the array, it could not for a moment be entertained, because our statute expressly provides that the defendant may challenge the array only in case the officer summoning the jury has acted corruptly, and has

wilfully summoned persons upon the jury known to be prejudiced against the defendant, and with a view to cause him to be convicted. (Code Crim. Proc., Art. 624.) But even this challenge is not allowed when the jurors have been selected by jury commissioners. In such case no challenge to the array is allowed. (Code Crim. Proc., Art. 625.)

But the objection made to the jury here reaches back to the selection of the jury by the commissioners, and does not impugn the fairness of the officer summoning the jury. Such being the case, we think the learned trial judge very properly entertained the motion, and heard evidence upon it, and, for aught that we can perceive in the record, very correctly overruled it. It was not shown that the commissioners, in selecting jurors, had practiced any fraud, or had acted corruptly, or that any error whatever had been committed by them, or by any one else in the premises. That the commissioners had not selected any negroes to serve as jurors would of itself be no valid objection to their action. A very large discretion is confided in the commissioners by the law. In the exercise of that discretion, within the limits of the law, their action, as before stated, cannot be questioned, except in an extreme case of fraud, corruption or gross error.

2. It is argued by counsel for defendant that Article 625 of the Code of Criminal Procedure, which prohibits a challenge to the array of jurors for any cause, where the jury has been selected by the jury commissioners, is in violation of the Fourteenth Amendment to the Constitution of the United States, which declares that " No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. Nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." We are not able to perceive wherein this provision of our Code, or any other provision relating to crime or criminal trials, to any extent or in any manner, violates the constitutional provision above quoted. Our laws make no distinction between colors, races, nationalities, or conditions of individuals, but regard all as equal and entitled to equal protection; and we believe we speak but the truth in asserting that in no State in the United States is justice more evenly meted out, and the laws more impartially administered to the citizens, without regard to whether

they be white or black, rich or poor, influential or obscure, than in our own State of Texas.

But the precise question here presented by counsel has been considered and settled against his position by the Supreme Court of this State, in *Williams* v. *The State*, 44 Texas, 34, wherein the court say: "A defendant is not denied equal rights with other citizens when he is required to observe a uniform rule of procedure, general to all others, in the administration of the criminal laws of the State." And this principle is also maintained by the Supreme Court of the United States, in the case of *Virginia* v. *Rives*, 100 U. S. Reps., 313. (See also *Nashville* v. *Shepherd*, 3 Baxt., Tenn., 373.)

3. It appears from a bill of exception in the record that, in testing the qualifications of jurors, the defendant proposed to propound to each person offered as a juror the following question, viz: "Have you the same neighborly regard for this defendant, though a negro, and his race generally, as you have for individuals of the white race?" Objection being made to this question by the district attorney, the court would not allow it to be propounded, but each juror was asked the statutory questions, and, in addition thereto, the defendant was permitted to ask each juror "if he could and would give to the defendant the same fair and impartial trial under the law and the evidence that he would give to a white man under the same circumstances, and would try the case without regard to the question of color." It is true that proper questions to test the bias in favor of, or the prejudice against a defendant, should be allowed in examining as to the fitness of a person offered as a juror to serve as such. But a question, to be proper, should be directed to the issue as to whether or not the person proposed as a juror is impartial, and in a condition of mind and feeling to try the case fairly. We cannot perceive that the question proposed by the defendant would be a proper one. If answered by the person to whom propounded in the negative, it certainly would not disqualify him as a juror, nor would it show that he was prejudiced against the defendant, or the defendant's race, nor that such person would be likely to be influenced in his verdict because he did not have the same "neighborly regard" for a negro that he had for a white man. If this were held to be sufficient cause to disqualify a person from serving as a juror, then all juries would have to be selected with reference to the race, nationality or class to which the defendant belonged; for, as a general rule,

no white man has the same neighborly or social regard for a ne-
gro that he has for a white man, and the case is the same with
the negro.  So with the Mexican, the Irishman, the German;
they have a greater neighborly regard for their own country-
men than for an American, and the American has a stronger
neighborly regard for one of his own country than for a for-
eigner.  This same objection as to neighborly regard would ap-
ply to *classes* as well as to races or nationalities; to farmers,
merchants, mechanics, doctors, lawyers, etc.  An individual
generally has a stronger neighborly regard for one of his own
class than for one of a different class.  We think the court was
correct in refusing to permit the proposed question to be pro-
pounded.  (*Lester* v. *The State*, 2 Texas Ct. App., 432.)

But, even if the question was improperly rejected, the rejec-
tion of it was a matter within the discretion of the trial judge,
the exercise of which discretion would not be revised by this
court unless it was made clearly to appear to us that the same
had been abused to the prejudice of the accused; and in this case
it does not so appear.  (*Ray* v. *The State*, 4 Texas Ct. App., 450;
*Gardenhire* v. *The State*, 6 Texas Ct. App., 147.)

4.    There is no bill of exceptions in the record which calls in
question the rulings of the court upon the admission or rejec-
tion of evidence.  It is too late to object to evidence, or to com-
plain of the rulings of the trial court in relation to it, for the
first time in this court.  Such objections must be made upon the
trial in the court below, and, if not there made, are to be con-
sidered on appeal as waived.  (*Waite* v. *The State*, 13 Texas Ct.
App., 169; *Etheridge* v. *The State*, 8 Texas Ct. App., 169.)

5.    No complaint is made, nor could any reasonably be made,
by the defendant against the charge of the court.  It was more
favorable to the defendant in several respects than the testimony
demanded.  We must commend the learned trial judge for ac-
cording to the defendant, as should always be done, especially
in cases of such magnitude as this one, *all*, and even *more*,
rights in the trial of the case than he was strictly entitled to un-
der the law and the evidence.  It has never been our duty to ex-
amine a case which had been tried with more care, and which
evinced on the part of the trial court a more scrupulous regard
for the rights of the accused, than this one. , After a careful ex-
amination of the record, we cannot hesitate to say that the de-
fendant has been fairly and impartially tried; and justly con-
victed.  It is conclusively shown by the evidence that he com-

mitted a deliberate, cruel and dastardly murder, and it is lawful and right that for this crime his life should be forfeited.

The judgment is affirmed.

*Affirmed.*

Opinion delivered December 1, 1883.

REPORTER'S NOTE.—After the affirmance of the judgment as directed by the foregoing opinion, the appellant's counsel filed a "petition for allowance of appeal to the Supreme Court of the United States upon writ of error," and, in the event of a disallowance, for an order of court directing its clerk to furnish to the appellant a copy of the record in this cause, so as to enable the appellant to prosecute his appeal to the Supreme Court of the United States. The substance of the petition was, that the law of Texas regulating the selection and organization of juries is in contravention of the first section of the Fourteenth Amendment to the Constitution of the United States. The specific grounds relied upon are distinctly indicated in the rulings of the court upon the merits of the case.

Upon this petition the court made the following order:

"PERRY CAVITT
  *vs.*              } In the Court of Appeals.
"THE STATE OF TEXAS.

"An inspection of the record will show that the matters complained of are not tenable; because it is shown that the jury commissioners, whose acts are the subject matter of complaint. were selected, and their action was had, before appellant had even committed the crime charged against him; and it is not perceived how the constitutional question sought to be raised can be invoked in the premises. The petition for writ of error is, therefore, refused. Should petitioner, however, desire a copy of the record on file in this court, with a view of applying to some judge of the Supreme Court of the United States for a writ of error, the clerk of this court will furnish said copy when applied for, and he is hereby ordered to do so."

*Ordered accordingly.*